IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 2, 2023

## IN RE AIRIES S.

**Appeal from the Juvenile Court for Scott County**
**No. 22-JV-21          Scarlett Wynne Ellis, Judge**

_____

**No. E2023-00462-COA-R3-PT**

_____

This appeal involves a petition to terminate parental rights.  The juvenile court found by clear and convincing evidence that three grounds for termination existed as to the mother: (1) abandonment by failure to support; (2) persistent conditions; and (3) failure to manifest an ability and willingness to assume custody or financial responsibility.  The juvenile court also found that the termination was in the best interest of the child.  The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and W. NEAL MCBRAYER, JJ., joined.

Mark Pienkowski, Knoxville, Tennessee, for the appellant, Ashley S.

Jonathan Skrmetti, Attorney General and Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.     FACTS & PROCEDURAL HISTORY

This matter involves the termination of parental rights of Ashley S. ("Mother") to her son Airies.[1][2]  Airies was previously in the custody of the Tennessee Department of Children's Services ("DCS") until Mother adopted him.  The adoption was finalized in

---

[1] It is this Court's policy to refrain from using the full names of children and other parties in parental termination cases in order to protect their identities.

[2] The parties' briefs differ on the spelling of the child's name.  After examining the record, we determine that the correct spelling is "Airies."

November 2019.  Mother is the only parent at issue in this case.

In September 2020, DCS became involved with the family after receiving a referral regarding allegations of a drug exposed child.  According to the referral, Mother was a "methamphetamine addict," and Airies, then eight years old, was present when Mother was using drugs.  The referral further stated that Mother "lets [Airies] stay with drug addicts" and "screams and hollers at [Airies] cause [sic] she's under the influence and can't take care of him."  A case manager from DCS met with Mother in October 2020, and Mother submitted to an oral drug screen.  The drug screen came back positive for methamphetamine and amphetamine.  Mother and the case manager completed a non-custodial permanency plan, which stated that Mother will obtain an Alcohol and Drug ("A&D") assessment and that Mother will refrain from using any illicit substances.  At that time, Mother did not have a home of her own and was "staying with friends," while Airies was residing with Mother's former paramour.  In December 2020, DCS held a Child and Family Team Meeting with Mother and her former paramour.  Mother's former paramour stated that he did not mind caring for the Child, but he wanted a break and did not want to be "tied down."  Mother's former paramour also knew about Mother's substance abuse and suspected that Mother was using drugs before the adoption was finalized.  On that same day, Mother completed a urine drug screen and tested positive for methamphetamine and amphetamine again.  After an A&D assessment, Mother was recommended inpatient treatment for drug addiction and was scheduled to be admitted in a rehabilitation facility the next day.  Mother also agreed to sign a power of attorney allowing her former paramour to care for Airies.  The next day, DCS confirmed with the rehabilitation facility that Mother had admitted herself into the inpatient facility, but Mother did not sign the power of attorney.  DCS had a meeting with Mother's former paramour to discuss non-custodial placement of Airies in his home.  He reiterated that he did not want to be "tied down" and did not wish to have long-term custody of Airies.  He also did not want to take any of the necessary classes to become a foster placement for Airies.

In December 2020, DCS filed a petition with the juvenile court seeking an immediate protective custody order and temporary care and custody of Airies pending a further hearing.  DCS also asked the juvenile court to find at a final hearing that Airies is dependent and neglected, that it is contrary to Airies's best interest to remain in the home, that reasonable efforts were made to prevent removal of Airies or that reasonable efforts were not required, and that there is no less drastic alternative to removal.  The juvenile court issued an ex parte protective custody order, finding that there was probable cause to believe that Airies was dependent and neglected and subject to an immediate threat to his health or safety to the extent that delay for a hearing on the matter would likely result in severe or irreparable harm.  Airies entered DCS custody in December 2020 and has remained in DCS custody since.  After Mother waived the preliminary hearing and adjudicatory hearing and stipulated to dependency and neglect based on improper supervision, the juvenile court ordered in February 2021 that DCS should retain temporary custody of Airies and that Mother have telephone calls with Airies, with DCS and the

guardian ad litem having the authority to modify visitation as appropriate.

In January 2021, DCS developed its first permanency plan, which was ratified by the juvenile court.[3]  The permanency plan required the following actions to be taken by Mother:

1. Complete mental health assessment and comply with recommendations;
2. Complete A&D evaluation and comply with recommendations;
3. Complete drug screens, including a hair follicle test;
4. Maintain stable and appropriate housing;
5. Maintain stable and appropriate employment;
6. Maintain legal and appropriate transportation or have a transportation plan;
7. Pay child support in the amount of $100 per month;
8. Have visitation as appropriate;
9. Complete the "STOP Program"[4];
10. Complete parenting classes and any subsequent recommendations from the service providers; and
11. Avoid criminal activity.

DCS developed four other permanency plans that were also ratified by the juvenile court in June 2021, December 2021, May 2022, and October 2022.  Throughout the permanency plans, the statement of responsibilities did not substantially change.

In February 2022, DCS filed a petition to terminate Mother's parental rights to Airies and alleged the following grounds: (1) abandonment by failure to support; (2) persistent conditions; and (3) failure to manifest an ability and willingness to assume custody or financial responsibility.  DCS also alleged that it was in Airies's best interest to terminate parental rights.  In response to the petition, Mother submitted a letter stating that she opposed the termination.  Mother later executed a surrender of her parental rights in September 2022, but she subsequently revoked it.  The juvenile court held a trial on the petition in January 2023.  At trial, Mother requested to be excused from the trial as she "[was] not going to be contesting [the] matter."  The court told Mother that she did not have to stay if she did not want to stay, but the juvenile court denied a request of Mother's counsel to be excused from the trial.  Mother's counsel also stated that he was advised not to contest the termination.

The juvenile court then heard testimony from Ms. Sheri Washam, who was a DCS foster care worker managing the case.  Ms. Washam expressed concern about Mother's history of substance abuse and relapse.  She stated that Mother had tested positive for

---

[3] The record does not contain this permanency plan.
[4] Although it is not directly stated in the record what the "STOP Program" is, it is clear from the context that it is a substance abuse rehabilitation program.

methamphetamine twice. An oral drug test was administered by DCS first, and Mother tested positive for methamphetamine. In November 2021, Mother again tested positive for methamphetamine in a hair follicle test. Additionally, there were four drug tests for which Mother failed to appear, and these screens were considered failed under DCS policy. Ms. Washam would notify Mother via phone calls or text messages that the drug screens were approved and would request that Mother come in at a specific time and location to take the tests. Mother would either fail to respond or reply "okay" to the text messages. Ms. Washam also testified that Mother admitted to recent substance abuse in a meeting. The STOP program had also reported to Ms. Washam that Mother had relapsed. Due to the relapses, DCS required Mother to complete another A&D assessment, but Ms. Washam had no proof that Mother completed this assessment.

Ms. Washam also testified concerning Mother's compliance with the permanency plans developed by DCS. Mother had acquired a job, and this employment lasted for five or six months out of the twenty-four months since Airies had been in DCS custody. Mother had also obtained transportation. Mother completed a mental health evaluation and it was recommended that she undergo individual counseling but she declined. Mother had gained stable housing with her former paramour and provided DCS with a lease, but DCS was not ready to move forward to bringing Airies to the home. Mother's former paramour tested positive for methamphetamine, and DCS would not let Airies go home to live with an active drug user. Ms. Washam also testified that that Mother received between six and seven hundred dollars a month in adoption subsidies for six or seven months while Airies was in the custody of DCS, but in the four months directly preceding the petition, Mother paid zero child support, although the permanency plans required her to pay $100 per month. However, Ms. Washam also stated that Mother did make two payments in child support recently. DCS submitted printouts from the Tennessee Child Support Enforcement Service into evidence confirming that Mother had paid $0.00 in child support in the four months preceding the filing of the petition and that Mother subsequently paid $412.00 in September 2022 and $275.00 in November 2022.

Regarding Mother's relationship with Airies, Ms. Washam testified that Airies thought of Mother "as his mother," but Mother and Airies had "an interesting relationship." She gave an example of an incident when she tried to get Airies to make a Mother's Day card, and Airies responded "Eh, I'll do it tomorrow." She further stated that Airies is actually closer to Mother's former paramour but that "he's always responded better to men." Ms. Washam also expressed concern about disclosures of sexual abuse that Airies made regarding Mother's nephew who touched him inappropriately and showed him pornography. She further stated that Mother did not believe these disclosures, and she had to "beg" Mother to stop talking about her nephew on phone calls with Airies. At the conclusion of Ms. Washam's testimony, she stated that there was consistent supervised visitation between Mother and Airies.

In March 2023, the juvenile court entered an order terminating parental rights and a

final decree of full guardianship. The juvenile court found that DCS had proven the following grounds against Mother: (1) abandonment by failure to support; (2) persistent conditions; and (3) failure to manifest an ability and willingness to assume custody or financial responsibility. The juvenile court further found that termination of Mother's parental rights was in the best interest of Airies. Mother subsequently appealed.

## II.    ISSUES PRESENTED

Mother presents the following issue for review on appeal, which we have slightly restated:

> 1.  Whether the juvenile court erred by finding that termination of Mother's parental rights is in the best interest of the child.

For the following reasons, we affirm the decision of the juvenile court.

## III.    STANDARD OF REVIEW

It is well established that "[a] parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521-22 (Tenn. 2016) (citing *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)). "Parental rights have been described as 'far more precious than any property right.'" *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 522). Despite being fundamental and constitutionally protected, however, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522 (citing *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010)). The decision to terminate a parent's rights to his or her child "has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent or the guardian of the child." *In re Carrington H.*, 483 S.W.3d at 522 (citing Tenn. Code Ann. § 36-1-113(l)). Thus, such a decision is one of the most serious decisions courts are called upon to make. *In re Mariah K.D.*, No. M2011-02655-COA-R3-PT, 2012 WL 3090313, at *6 (Tenn. Ct. App. July 30, 2012). Accordingly, "[n]o civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015) (citing Tenn. Code Ann. § 36-1-113(l)).

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination as provided in section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interest

of the child under the factors set forth in section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *In re Bernard T.*, 319 S.W.3d at 596 (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). It also "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

Due to the heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review the trial court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure and presume each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

On appeal, Mother presents the sole issue of whether the juvenile court erred in finding that termination of Mother's parental rights was in the best interest of Airies. Nevertheless, "in an appeal from an order terminating parental rights [we] must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. Therefore, we review each of the three grounds for termination found against Mother and whether termination was in Airies's best interest.

### A.     *Grounds for Termination*

### 1.     Abandonment by Failure to Support

The first ground on appeal is abandonment by failure to support. The juvenile court found that there was clear and convincing evidence for this ground supporting termination of Mother's parental rights. This ground exists when a parent or guardian has abandoned his or her child, as defined in Tennessee Code Annotated section 36-1-102(1)(A). Tenn.

Code Ann. § 36-1-113(g)(1).[5]   Within section 36-1-102(1)(A) are "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Ciara O.*, No. E2022-01179-COA-R3-PT, 2023 WL 3337215, at *4 (Tenn. Ct. App. May 10, 2023) (citing *In re Audrey S.*, 182 S.W.3d at 863)).  As relevant in this case, abandonment by failure to support is defined as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent . . . either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).[6]  The statute further defines failure to support as the failure "to provide monetary support" or "to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D).  "Token support" is support that "under the circumstances of the individual case, is insignificant given the parent's means[.]"  Tenn. Code Ann. § 36-1-102(1)(B).

Here, DCS filed the petition to terminate parental rights on February 22, 2022. Therefore, the four-month period immediately preceding the filing of the petition ran from October 21, 2021 to February 21, 2022.  The permanency plans required that Mother pay a total of $400.00 in these four months; however, it is undisputed that Mother did not pay any amount of money in child support during this period.  We recognize that Mother made significant payments of child support in September 2022 and in November 2022. Nevertheless, "[a]bandonment may not be repented of by resuming . . . support subsequent to the filing of any petition seeking to terminate parental . . . rights . . . [.]"  Tenn. Code Ann. § 36-1-102(1)(F).  Therefore, the payments do not negate this ground based on her failure to pay child support during the relevant four-month period preceding the filing of the petition.  *See In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *6 (Tenn. Ct. App. Aug. 15, 2023) ("[A]lthough Mother later largely paid her arrearage on

[5] Since the filing of the petition to terminate parental rights, the termination statute has been amended.  All quotes and references to the termination statute in this opinion are to the version of the statute in effect when the petition was filed in February 2022.  *See In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

[6] A parent may raise the affirmative defense of absence of willfulness.  Tenn. Code Ann. § 36-1-102(1)(I).  Here, however, Mother did not raise this affirmative defense in an answer to the petition. Furthermore, Mother did not raise absence of willfulness as a defense at trial.  Therefore, Mother waived that affirmative defense.  *See* Tenn. R. Civ. P. 12.08 (specifying that affirmative defenses not raised by motion or answer are waived).  *See also In re Leah T.*, No. M2022-00839-COA-R3-PT, 2023 WL 4131460, at *6 (Tenn. Ct. App. June 22, 2023) (finding that a parent who did not raise lack of willfulness as an affirmative defense in the answer to a petition and amended petition to terminate parental rights waived it as a defense to abandonment by failure to support).

child support following the filing of the termination petition, this late payment does not absolve Mother of her failure to pay during the relevant time period."). Thus, the juvenile court correctly determined that Mother's abandonment by failure to support was a proper ground for termination of Mother's parental rights.

## 2. Persistent Conditions

We next address whether the juvenile court erred in finding clear and convincing evidence to support the ground of persistent conditions. This ground applies when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each element must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

This Court has explained that "[t]he necessary order of removal is 'the threshold consideration' for this ground." *In re Lucas S.*, No. M2019-01969-COA-R3-PT, 2021 WL 710841, at *4 (Tenn. Ct. App. Feb. 24, 2021) (quoting *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015)). As previously stated, in December 2020, DCS filed a petition in the juvenile court alleging that Airies was dependent and neglected. The juvenile court then entered an ex parte protective custody order finding probable cause to believe that Airies was dependent and neglected. The court then removed Airies from Mother's legal custody and awarded legal

custody to DCS.  In February 2022, DCS filed its petition to terminate Mother's parental rights, and the trial was held in January 2023.  Therefore, more than two years had passed from the time Airies was removed from Mother's custody until the time the trial was held, which well exceeded the necessary period of six months for this ground.  Tenn. Code Ann. § 36-1-113(g)(3)(B).

Airies was removed from Mother's legal custody due to Mother's drug use and lack of supervision.  Mother's substance abuse continued, and though Mother has found housing with her former paramour, the home is unsuitable because her former paramour has tested positive for methamphetamine.  Thus, this condition that led to the removal of Airies has persisted, and it has prevented the safe return of Airies to Mother's custody.  Since Mother did not cease to use drugs in the two years between the initial protective custody order and the trial, there is little likelihood that these conditions will be remedied at an early date so that Airies can be safely returned to Mother in the near future.  Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii); *Dep't of Children's Servs. v. B.B.M.*, No. E2006-01677-COA-R3-PT, 2007 WL 431251, at *9 (Tenn. Ct. App. Feb. 9, 2007) ("Given that Mother has been unable to remedy these problems for many years, it is unlikely that these conditions would be remedied at any time in the near future.").  Furthermore, we find the continuation of the parent-child relationship would greatly diminish Airies's chances of early integration into a safe, stable, and permanent home.  Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii).  Airies is doing well in a stable environment of foster care and school, and no problems or concerns have been reported.  Accordingly, we conclude that the juvenile court did not err in finding that DCS had proven the ground of persistent conditions.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility

We now turn to address the ground of failure to manifest an ability and willingness to assume custody or financial responsibility.  The juvenile court found that there was clear and convincing evidence for this ground supporting termination of Mother's parental rights.  This ground exists when "[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]"  *Id.* § 36-1-113(g)(14).  There are two elements necessary to prove for this ground.  *In re Neveah M.*, 614 S.W.3d at 674.

The first element "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child."  *Id.* at 677.  Therefore, if the petitioner "seeking to terminate parental rights proves by clear and convincing proof that a parent . . . has failed to manifest either ability or willingness, then the first prong of the statute is satisfied."  *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June

20, 2018)). A parent's ability to assume custody or financial responsibility is evaluated based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (citation omitted). As for willingness, it is common for parents to state that they are willing to assume custody or financial responsibility; however, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). While Mother had completed some of the steps required of her in the permanency plans, she did not sustain those efforts. By her relapses and failed drug tests, Mother has not shown that she is able to remain sober, and further, she has not shown that she is willing or able to complete the steps required for her to assume custody of Airies. Mother also did not make the payments in child support required by the permanency plans while she was collecting adoption subsidy payments. These failures to complete the actions necessary to have Airies back in her home or make payments in child support evince both a lack of ability and a lack of willingness on Mother's part to assume custody or financial responsibility of Airies.

The second element requires the petitioner to prove by clear and convincing evidence that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *In re Neveah M.*, 614 S.W.3d at 677 (quoting Tenn. Code Ann. § 36-1-113(g)(14)). We have described this ground before as follows:

> "[T]he use of the modifier 'substantial' indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not."

*In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021). Further, "parents with a significant, recent history of substance abuse . . . could lead to a conclusion of a risk of substantial harm." *Id.* Mother's history of relapsing and continuing inability to maintain a home for Airies that is free of drug use mean that returning Airies to Mother's custody would pose a sufficiently probable risk of substantial harm to Airies's physical or psychological welfare. Tenn. Code Ann. § 36-1-113(g)(14). Therefore, the juvenile court correctly determined that Mother's failure to manifest an ability and willingness to assume custody or financial responsibility was a proper ground for termination of Mother's parental rights.

### B. Best Interest of the Child

We now turn to address Mother's single issue as to whether the juvenile court erred in finding that it was in the best interest of Airies to terminate her parental rights. The Tennessee Supreme Court has summarized the law regarding the best interest analysis as

follows:

Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).[7] The twenty statutory best-interests factors are:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

---

[7] Although the prior version of the best interest factors was in effect in *In re Gabriella D.*, we have recently stated that "we believe the Tennessee Supreme Court's analysis applies to the amended version of Tenn. Code Ann. § 36-1-113(i), as well." *In re Skylith F.*, No. M2022-01231-COA-R3-PT, 2023 WL 6546538, *19 n.7 (Tenn. Ct. App. Oct. 9, 2023).

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of

the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1)(A)-(T). "When considering the factors [above], the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2). The juvenile court found that the majority of the applicable factors favored termination of Mother's parental rights.

We begin by addressing the interrelated factors concerning the child's critical need for stability and continuity of placement; the effect a potential change of caretakers and physical environment would have on the child; and the parent's demonstration of continuity and stability in meeting the child's basic material, educational, housing, and safety needs. Tenn. Code Ann. § 36-1-113(i)(1)(A), (B), and (C). Being in the foster home for more than two years has provided Airies with a stability at home and in school that he did not experience for long while he was in the custody of Mother. As a child who was

fostered and adopted before, Airies needs a stable home and continuity of placement throughout the rest of his minority. Mother argues that nothing shows that the foster home is pre-adoptive or "offered the prospective of permanency[,]" and that "[a] return of custody to a future-rehabilitated [Mother] is one less transition than to an entirely new custodian." However, Mother has neither provided nor demonstrated that she can provide stability in meeting Airies's needs any time soon due to her continued drug use and living situation. Although Mother may or may not have demonstrated sufficient continuity and stability in meeting Airies's needs while she fostered and adopted him, her actions have proven that she cannot currently provide such continuity and stability. Therefore, we agree with the juvenile court that factors (A), (B), and (C) weigh in favor of termination.

Mother and Airies do not have a secure or healthy parental attachment, and there was no reasonable expectation that she could create such attachment because Mother has not completed enough action steps in the permanency plans to allow her a substantial increase in visitation with Airies. Tenn. Code Ann. § 36-1-113(i)(1)(D). The Child also does not have an emotionally significant relationship with Mother or with any biological family, and therefore there would not be a significant impact on the outcomes of the relationship by terminating Mother's parental rights. Tenn. Code Ann. § 36-1-113(i)(1)(I). While Airies thinks of Mother as his mother, testimony from Ms. Washam revealed that the bond between Mother and Airies is not deep, and Airies has a closer bond to Mother's former paramour. Likewise, although Mother consistently attended visitation with Airies, the visitation was not sufficient to create a positive relationship. Tenn. Code Ann. § 36-1-113(i)(1)(E). Furthermore, Mother triggers Airies's experience of trauma by continuing to speak with him about Mother's nephew who sexually abused him, despite Ms. Washam begging Mother to stop. Tenn. Code Ann. § 36-1-113(i)(1)(G). Therefore, we agree with the juvenile court that factors (D), (E), (G), and (I) weigh in favor of termination.

In regard to factors (J) and (K), by her continued drug use and living with a known drug addict, Mother failed to demonstrate a lasting adjustment of circumstances to make it safe for Airies to be in her home and failed to take advantage of available programs and services in order to make such a lasting adjustment. Tenn. Code Ann. § 36-1-113(i)(1)(J) and (K). Though DCS developed a number of permanency plans, Mother either did not follow many of the recommendations at all or simply did not sustain her initial efforts to follow the recommendations. She continued to use drugs, and she moved in with an active drug user. Though the juvenile court did not make an explicit separate finding regarding factor (L), we find that this factor also weighs in favor of termination of Mother's parental rights. DCS made several efforts to assist Mother in making lasting adjustments while Airies was in custody, but Mother did not effect lasting change. Tenn. Code Ann. § 36-1-113(i)(1)(L). Mother's failure to complete the recommended steps for addressing her substance abuse and lack of a safe home also lead us to conclude that Mother had no sense of urgency in establishing custody of Airies or in making a lasting adjustment of the circumstances that make awarding custody to Mother unsafe and not in Airies's best interest. Tenn. Code Ann. § 36-1-113(i)(1)(L) and (M). Thus, we agree with the juvenile

- 14 -

court that factors (J), (K), and (M) weigh in favor of termination, and we further conclude that factor (L) weighs in favor of termination of Mother's parental rights.

Regarding factors (P), (Q), and (R), Mother failed to demonstrate an understanding of Airies's needs, failed to demonstrate the ability and commitment to creating and maintaining a home that met Airies's needs, and did not have a physical environment in her home that was healthy and safe for him. Tenn. Code Ann. § 36-1-113(i)(1)(P), (Q), and (R). Mother argues that there is no evidence that points toward the home being unclean or structurally unsafe. However, even after Airies was taken from Mother for drug abuse and lack of supervision, Mother continued to abuse drugs and moved back in with her former paramour who tested positive for methamphetamine use, rendering her home unsafe for Airies. *See In re Robert H.*, No. E2022-00809-COA-R3-PT, 2023 WL 3451534, at *10 (Tenn. Ct. App. May 15, 2023) ("Father's sustained drug use during the Department's custodial period militates against concluding that he is able and committed to provide the children with a safe home."). We therefore agree that factors (P), (Q), and (R) weigh in favor of termination.

With regard to factor (S), Mother paid no more than token child support. Tenn. Code Ann. § 36-1-113(i)(1)(S). Mother argues that the payments in total of $687.50 in child support are equivalent to almost seven months of support payments and demonstrate a significant effort to pay her child support obligation. These payments, however, were made after the petition for termination of parental rights, almost two years after removal of Airies from Mother's custody. Therefore, we also agree that factor (S) weighs in favor of termination.

As to factor (T), it is evident that Mother's mental and emotional condition from her drug use would be detrimental to the Child and prevent her from parenting effectively. Tenn. Code Ann. § 36-1-113(i)(1)(T). *See In re Riley B.*, No. E2022-00684-COA-R3-PT, 2023 WL 3477216, at *14 (Tenn. Ct. App. May 16, 2023) (stating in the context of this factor that "we are concerned with Mother's ability to remain sober given . . . drug screens showing her tendency to relapse"). Furthermore, Mother did not follow the recommendation of attending individual therapy after her mental health assessment. Thus, we agree with the juvenile court that factor (T) weighs in favor of termination.

Finally, we find that factors (F), (H), (N), and (O) are inapplicable. There is no evidence in the record that Airies would fear living in a home with Mother. Tenn. Code Ann. § 36-1-113(i)(1)(F). There is likewise a dearth of evidence in the record of any healthy parental attachment Airies may have with another person or persons in the absence of Mother. Tenn. Code Ann. § 36-1-113(i)(1)(H). Although there was testimony that Mother's nephew had sexually abused Airies in the past, there is no indication that this cousin currently resides in or frequents Mother's home. Tenn. Code Ann. § 36-1-113(i)(1)(N). Finally, there is nothing in the record that speaks to whether Mother ever provided safe and stable care for Airies or any other child. Tenn. Code Ann. § 36-1-

- 15 -

113(i)(1)(O).  Therefore, we do not consider factors (F), (H), (N), and (O).

After reviewing these statutory factors, we agree that it is in the best interest of Airies for Mother's parental rights to be terminated.  Accordingly, we conclude that the juvenile court did not err in finding that the termination was in the Child's best interest.

**V.     CONCLUSION**

For the aforementioned reasons, we affirm the decision of the juvenile court. Costs of this appeal are taxed to the appellant, Ashley S., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE